**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Rentech WP U.S. Inc., *et al.*,[1] | : | Case No. 17-12958 (CSS) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |

---------------------------------------------------------- x

**DECLARATION OF PAUL SUMMERS,**
**CHIEF FINANCIAL OFFICER OF RENTECH WP U.S. INC. AND RENTECH, INC.,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, Paul Summers declares as follows under the penalty of perjury:

1.      I am the Chief Financial Officer of Rentech WP U.S. Inc., a Delaware corporation ("**Rentech WP**"), and the Chief Financial Officer of Rentech, Inc., a Colorado corporation ("**Rentech, Inc.**" and, together with Rentech WP, the "**Debtors**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.      Since 2006, I have held various roles at Rentech, Inc., including Vice President, Treasurer, and Senior Director of Corporate Development. In addition, since November 2016, I have served as the Chief Financial Officer of each of the Debtors. In my role as Chief Financial Officer, I am responsible for overseeing the accounting, operations, and financial activities of Rentech (as defined below), including but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning. As a result of my 11-year tenure with Rentech, Inc., my review of public and non-public documents, and my discussions with other members of Rentech's management team, I am generally familiar with Rentech's businesses, financial condition, policies and procedures, day-to-day operations, and books and records.

---

[1]      The Debtors, together with the last four digits of each Debtor's U.S. federal tax identification number, are Rentech WP U.S. Inc. (7863) and Rentech, Inc. (7421). The address for the Debtors is 10880 Wilshire Boulevard, Suite 1101, Los Angeles, CA 90024.

Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from Rentech's employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration.  References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On December 19, 2017 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to operate and manage their assets as debtors in possession.

4.      As shown on the corporate organizational chart attached hereto as **Exhibit A**, Rentech, Inc. has 37 direct and indirect non-debtor subsidiaries (the "**Non-Debtor Subsidiaries**" and, together with the Debtors, "**Rentech**") in addition to Rentech WP, which is a wholly owned direct subsidiary of Rentech, Inc.  The Non-Debtor Subsidiaries are not chapter 11 debtors and will not be subject to the requirements of Title 11 of the United States Code, 11 U.S.C. § 101 *et. seq.*, as amended (the "**Bankruptcy Code**").

5.      I submit this First Day Declaration on behalf of the Debtors in support of their (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the above-captioned chapter 11 cases (together,

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

the "**Chapter 11 Cases**") on Rentech's businesses. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of Rentech's businesses and to successfully maximize the value of the Debtors' estates.

6.     Part I of this First Day Declaration provides an overview of Rentech's businesses, organizational structure, capital structure, significant prepetition indebtedness, and certain prepetition activities, as well as a discussion of Rentech's financial performance and the events leading to the Debtors' chapter 11 filings. Part II sets forth the relevant facts in support of the First Day Pleadings.

<div align="center">

**PART I**

</div>

I.     **COMPANY AND BUSINESS OVERVIEW**

    A.     **Overview of Operations**

7.     Rentech is a wood fibre processing company with three core businesses: (i) contract wood handling and chipping services; (ii) the manufacture and sale of wood pellets for the U.S. heating market; and (iii) the manufacture, aggregation, and sale of wood pellets for the utility and industrial power generation market.

8.     Rentech is effectively comprised of the following segments: (1) New England Wood Pellet, LLC and its non-debtor subsidiaries (collectively, "**NEWP**"); (2) Fulghum Fibres, Inc. and its U.S. non-debtor subsidiaries (collectively, "**Fulghum US**"); (3) the South American non-debtor subsidiaries of Fulghum Fibres, Inc. (collectively, "**Fulghum SA**", and together with Fulghum US, "**Fulghum**");[3] (4) Rentech, Inc.'s direct and indirect Canadian non-debtor

---

[3]     Fulghum Fibres, Inc. also owns 50% of Fulghum Fibres New Zealand Limited ("**Fulghum New Zealand**"), which is non-operational.

subsidiaries (collectively, "**Rentech Canada**");[4] and (5) Rentech, Inc., Rentech WP, and all other direct and indirect U.S. non-debtor subsidiaries of Rentech, Inc. (collectively, "**Rentech US**").

        1.     **Operations**

        a.     <u>Wood Handling and Chipping Services – Fulghum</u>

9.     The majority of Fulghum's customers are large pulp, paper, and packaging manufacturers who use wood chips from Fulghum's mills to manufacture products such as boxboard, containerboard, paper, and medium density fiberboard for building products. Fulghum US sells wood chips to customers in the United States, while Fulghum SA provides services to customers in South America and sells wood chips to customers in Japan. The majority of Fulghum's customers use wood chips from Fulghum's 26 mills.[5]

10.     Fulghum US's revenue is primarily generated from fees under exclusive processing agreements. Each of Fulghum US's mills typically operates under an exclusive processing agreement with a single customer. At its mills, Fulghum US is paid a processing fee based on tons processed, with minimum volume base rates and a reduced fee rate for higher volumes.

11.     Fulghum SA's operations include chipping services that earn fees based on a per ton processing fee structure. Its operations also involve the sale of wood chips for export, the local sale of bark for industrial heat and utility applications, the management of forestland, and the buying and trading of wood chips.

---

[4]     RTK (Luxembourg) WP S.A.R.L. ("**Rentech Luxembourg**") is the parent of many of Rentech's Canadian entities, and is included as part of Rentech Canada for purposes of this Declaration.

[5]     Fulghum US operates 22 wood chipping mills in the United States, and Fulghum SA operates four wood chipping mills in South America.

b.      Wood Pellets – NEWP

12.     NEWP, whose facilities and customers are located in the Northeastern United States,[6] is one of the largest producers of wood pellets for the United States residential and commercial heating markets.  NEWP primarily sells its wood pellets to big-box and specialty retailers, including lawn and garden centers, heating supply stores, hardware stores, markets, and convenience stores.  It also sells pellets in bulk to large institutions, including schools, universities, and governmental agencies, to heat buildings.

c.      Industrial Wood Pellets – Rentech Canada

13.     Rentech Canada's wood pellet business consists of its wood pellet production facilities in Atikokan, Ontario (the "**Atikokan Facility**") and Wawa, Ontario (the "**Wawa Facility**").  The Wawa Facility is owned by RTK WP Canada, ULC ("**RTK WP Canada**"), an unlimited liability company incorporated in British Columbia, Canada, and the Atikokan Facility is owned by RTK WP2 Canada, ULC ("**RTK WP2 Canada**"), an unlimited liability company incorporated in British Columbia, Canada.  The wood pellets produced at the Atikokan Facility are used primarily for utility power generation in Canada, while the wood pellets produced at the Wawa Facility are used primarily for utility power generation in the United Kingdom.

14.     In February 2017, Rentech decided to idle the Wawa Facility and reduce production at the Atikokan Facility because, among other reasons: (i) Rentech Canada was experiencing difficulty ramping up production and additional capital would have been required to increase production to levels near the design capacity of the facilities; (ii) projected operating

---

[6]      NEWP's facilities are located in Jaffrey, New Hampshire, Deposit, New York, Schuyler, New York, and Youngsville, Pennsylvania.

costs exceeded original expectations; (iii) there was uncertainty regarding future profitability of the facilities; and (iv) there were equipment issues at the Wawa Facility.[7]

(1)    Winding Down of Rentech Canada

15.    The Wawa Facility is subject to a number of construction lien claims, and the assets of RTK WP Canada are secured in favor of the Term Loan Agent (as defined below). RTK WP Canada has commenced an application to the Ontario Superior Court of Justice requesting an order appointing a receiver over its assets, including the Wawa Facility, which is RTK WP Canada's only asset with significant value.  If such an order is granted, the Wawa Facility will be liquidated within this receivership.  The proceeds from the sale will be used to pay the construction lien claimants, and any remaining proceeds will be paid to the Term Loan Agent on account of the Term Loan Obligations.  Rentech does not anticipate that proceeds from this liquidation will exceed the amounts owing to RTK WP Canada's secured creditors.

16.    Rentech has conducted a sale process with respect to the Atikokan Facility, and has entered into an agreement to sell that facility (the "**Atikokan Sale**").  It is anticipated that the proceeds of a sale of the Atikokan Facility will be used to satisfy the claim of a construction lien claimant in its entirety.  Any remaining proceeds will be paid to the Term Loan Agent, who has a lien on all of the assets of RTK WP2 Canada.

2.    **Offices and Employees**

17.    As of the Petition Date, the Debtors have 13 full-time employees, eight of whom work at the Debtors' offices in Los Angeles, California, two of whom work at the Debtors' offices in Jaffrey, New Hampshire, two of whom work at the Debtors' offices in Atlanta, Georgia, and one of whom works remotely from Manhattan Beach, California.  The Debtors'

---

[7]    Although the Wawa Facility is idled, a small workforce remains in place to maintain the facility, so that it can resume operations with minimal costs and time.

employees provide financial, accounting, legal, human resource, and other administrative services that support Rentech's operating entities.[8]   None of the Debtors' employees are represented by a labor union.

### 3.    Rentech Nitrogen Partners L.P. and the CVR Investment

18.    On March 14, 2016, Rentech Nitrogen Partners, L.P. ("**RNP**"), a majority of which was indirectly owned by Rentech, Inc., completed the sale of Rentech Nitrogen Pasadena Holdings, LLC to Interoceanic Corporation.   Rentech Nitrogen (as defined below) received approximately $6.0 million from the sale.[9]

19.    On April 1, 2016, RNP and Rentech Nitrogen GP, LLC merged with affiliates of CVR Partners, L.P. ("**CVR**").   RNP ceased to be a publicly traded company and became a wholly-owned subsidiary of CVR, a publicly traded master limited partnership that owns and operates two nitrogen fertilizer product manufacturing facilities.   Each outstanding unit of RNP was exchanged for 1.04 common units of CVR (the "**CVR Common Units**") and $2.57 of cash. Rentech received merger consideration of $59.8 million in cash and approximately 24.2 million CVR Common Units.   After consummating the transaction, Rentech transferred approximately 17 million CVR Common Units and $10 million in cash to certain funds managed by or affiliated with GSO Capital Partners LP ("**GSO**")[10] to (i) repurchase and retire $100 million of Rentech, Inc.'s Series E Convertible Preferred Stock held by such funds and (ii) repay approximately $41.7 million under the Term Loan Credit Agreement (as defined below).

---

[8]    Rentech leases 600 square feet of office space in Washington, DC, where it previously had its headquarters, and 900 square feet of office space in Los Angeles, California.  Rentech Canada, Fulghum, and NEWP lease office space in Thunder Bay, Ontario, Augusta, Georgia, and Jaffrey, New Hampshire, respectively.

[9]    The sale agreement also requires a milestone payment to be made to former RNP unitholders equal to 50% of the facility's EBITDA, in excess of $8.0 million cumulatively earned over the two year period ending on March 31, 2018.

[10]    GSO manages or is affiliated with the Term Loan Lenders (as defined below).

20.     On November 30, 2017, Rentech Nitrogen Holdings, Inc. ("**Rentech Nitrogen**"), a Non-Debtor Subsidiary and borrower under the Term Loan Credit Agreement, entered into that certain Share Exchange Agreement (together with the other documents related to, referenced in, or executed in connection with the Share Exchange Agreement prior to the Petition Date, the "**Exchange Agreement**"), with the Term Loan Lenders and the Term Loan Agent.  Pursuant to the Exchange Agreement, Rentech Nitrogen transferred its remaining 7,187,630 CVR Common Units to certain funds managed by or affiliated with GSO to satisfy $22,396,682.35 of the outstanding Term Loan Obligations (as defined below) and the accrued and unpaid interest and fees thereon (the "**CVR Unit Transfer**").

B.     **Corporate Structure**

21.     Rentech, Inc. was incorporated under the laws of the state of Colorado on December 18, 1981.  Rentech, Inc. is the direct parent of Rentech WP and directly or indirectly owns the Non-Debtor Subsidiaries.  Rentech, Inc. is a public holding company, and its operations relate to the governance and operation of the Rentech organization as a whole.

22.     Rentech WP, which was incorporated under the laws of the state of Delaware on January 24, 2013, is a wholly owned subsidiary of Rentech, Inc. and the parent of Fulghum US, Fulghum SA, NEWP, and certain other Non-Debtor Subsidiaries.  Rentech WP is a holding company and has no operations or employees.

C.     **Initial Public Offering and Listing of Common Stock**

23.     In April 1991, Rentech, Inc. completed an initial public offering of its common stock and was listed on the Nasdaq Capital Market (formerly the Nasdaq SmallCap Market) under the symbol "RNTK".  On June 17, 1999, Rentech, Inc.'s symbol on the Nasdaq Capital Market changed to "RNTKC".  From August 17, 1999 to April 4, 2000, Rentech, Inc. traded on the OTC Bulletin Board under the symbol "RNTK".  From April 5, 2000 to August 12, 2013, the

stock traded on the NYSE American Stock Exchange (formerly the American Stock Exchange and NYSE Alternext U.S.) under the symbol "RTK". From August 13, 2013 to October 13, 2017, the stock traded on the Nasdaq Capital Market under that same symbol. On October 16, 2017, the listing of Rentech, Inc.'s shares was transferred to the OTCQB Market, where they are currently trading under the symbol "RTKH".

24.    As of Decembers 13, 2017, Rentech, Inc. had approximately (i) 23.2 million common shares outstanding, of which approximately 331,024 were held by members of Rentech, Inc.'s Board of Directors of and its named executive officers, and (ii) 1.8 million shares of common stock issuable pursuant to stock options, stock warrants, and restricted stock units.

D.    **Summary of Prepetition Secured Debt**

1.    **Term Loan Credit Agreement**

25.    Rentech Nitrogen is party to that certain Second Amended and Restated Term Loan Credit Agreement, dated as of April 1, 2016 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Term Loan Credit Agreement**" and, together with all other loan documents, security instruments, and other documents related to, referenced in, or executed in connection with the Term Loan Credit Agreement prior to the Petition Date, the "**Term Loan Documents**"), with GSO Special Situations Master Fund LP, GSO Palmetto Opportunistic Investment Partners LP, GSO Credit-A Partners LP, Steamboat Credit Opportunities Master Fund LP, GSO Coastline Credit Partners LP, GSO Cactus Credit Opportunities Fund LP, and GSO Aiguille des Grands Montets Fund II LP, as the lenders (collectively, the "**Term Loan Lenders**"),[11] and Credit Suisse AG, Cayman Islands Branch, as

---

[11]    The Term Loan Lenders are funds managed by or affiliated with GSO.

administrative agent (the "**Term Loan Agent**"), pursuant to which the Term Loan Lenders made certain loans to Rentech Nitrogen.

26.     As of the Petition Date, the aggregate outstanding principal amount under the Term Loan Documents was approximately $19.5 million and the accrued and unpaid interest was $366,420.19 (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Term Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the Term Loan Documents, collectively, the "**Term Loan Obligations**").

27.     In connection with the Term Loan Credit Agreement, the Debtors and certain Non-Debtor Subsidiaries entered into that certain Second Amended and Restated Guaranty Agreement (the "**Term Loan Guaranty**"), dated as of April 1, 2016, in favor of the Term Loan Agent for the benefit of the Term Loan Lenders.  Under the Term Loan Guaranty, the Debtors guaranteed Rentech Nitrogen's payment of the Term Loan Obligations and its performance under the Term Loan Credit Agreement.  The Debtors and certain Non-Debtor Subsidiaries also entered into that certain Security Agreement (the "**Term Loan Security Agreement**"), dated as of February 12, 2015, with the Term Loan Agent, for the benefit of the Term Loan Lenders, to secure the Term Loan Obligations of Rentech Nitrogen.  Pursuant to the Term Loan Documents, the Debtors granted to the Term Loan Lenders security interests in and liens on certain assets of the Debtors as described in the Term Loan Security Agreement (the "**Term Loan Liens**"),

including, without limitation, all (a) Accounts,[12] (b) Chattel Paper, (c) Commercial Tort Claims described on Schedule VI of the Term Loan Security Agreement, (d) Commodity Accounts, (e) Contracts, (f) Deposit Accounts, (g) Documents, (h) Equipment, (i) General Intangibles, (j) Incidental Rights, (k) Instruments, (l) Intellectual Property and Intellectual Property Licenses, (m) Inventory, (n) Investment Property, (o) Letter-of-Credit Rights, (p) Payment Intangibles, (q) Securities Accounts (and all Investment Property held therein or credited thereto), (r) Vehicles, (s) Goods and other property not aforementioned, (t) books and records pertaining to any and/or all of the Term Loan Collateral (as defined below), and (u) Proceeds and products of any and all of the foregoing, all Supporting Obligations in respect of any of the foregoing, and all collateral security and guarantees given by any Person with respect to any of the foregoing (collectively, subject to certain exclusions set forth in the Term Loan Documents, the "**Term Loan Collateral**").[13]

28.     The Debtors believe that the Term Loan Lenders are over-secured by approximately $12 million.

2.     **BMO Credit Agreement**

29.     Rentech, Inc. is also party to that certain Credit Agreement, dated as of November 25, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "**BMO Credit Agreement**" and, together with all other loan documents, security instruments, and other documents related to, referenced in, or executed in connection with the BMO Credit Agreement prior to the Petition Date, the "**BMO Prepetition Documents**" and, together with the

---

[12]     Capitalized terms used in this Paragraph 27 but not defined herein shall have the meanings ascribed to such terms in the Term Loan Documents.

[13]     Rentech Canada also entered into that certain Canadian Security Agreement, dated as of February 12, 2015, with the Term Loan Agent, for the benefit of the Term Loan Lenders to secure the Term Loan Obligations of Rentech Nitrogen.  Pursuant to the Canadian Security Agreement, Rentech Canada granted the Term Loan Lenders security interests in and liens on certain assets of Rentech Canada, as more fully described in the Term Loan Documents.

Term Loan Documents, the "**Prepetition Documents**"), with Bank of Montreal ("**BMO**" and, together with the Term Loan Lenders, the "**Prepetition Lenders**"), pursuant to which BMO agreed to extend $10 million of revolving credit to Rentech, Inc., which Rentech, Inc. was able to utilize in the form of standby letters of credit issued by BMO (the "**Letters of Credit**") for the account of Rentech, Inc. and its Subsidiaries (as defined in the BMO Credit Agreement).[14]

30.    To secure the Obligations (as defined in the BMO Credit Agreement), Rentech, Inc. entered into that certain Security Agreement (the "**BMO Security Agreement**"), dated as of March 2, 2015, with BMO. Pursuant to the BMO Prepetition Documents, Rentech, Inc. granted to BMO security interests in and liens on certain assets of Rentech, Inc., as described in the BMO Security Agreement (the "**BMO Prepetition Liens**" and, together with the Term Loan Liens, the "**Prepetition Liens**"), including, without limitation, all (a) Accounts,[15] (b) Chattel Paper, (c) Commercial Tort Claims described on Schedule VI of the BMO Security Agreement, (d) Commodity Accounts, (e) Contracts, (f) Deposit Accounts, (g) Documents, (h) Equipment, (i) General Intangibles, (j) Incidental Rights, (k) Instruments, (l) Intellectual Property and Intellectual Property Licenses, (m) Inventory, (n) Investment Property, (o) Letter-of-Credit Rights, (p) Payment Intangibles, (q) Securities Accounts (and all Investment Property held therein or credited thereto), (r) Vehicles, (s) Goods and other property not aforementioned, (t) books and records pertaining to any and/or all of the BMO Prepetition Collateral (as defined below), and (u) Proceeds and products of any and all of the foregoing, all Supporting Obligations in respect of any of the foregoing, and all collateral security and guarantees given by any Person

---

[14]    Under the BMO Credit Agreement, Rentech, Inc. was also required to pay (i) a letter of credit fee of 3.75% per annum on the daily average face amount of the letters of credit outstanding during the preceding calendar quarter and (ii) a commitment fee on the average daily undrawn portion of the credit facility at a rate equal to 0.75% per annum.

[15]    Capitalized terms used in this Paragraph 30 but not defined herein shall have the meanings ascribed to such terms in the BMO Prepetition Documents.

with respect to any of the foregoing (collectively, subject to certain exclusions set forth in the BMO Prepetition Documents, the "**BMO Prepetition Collateral**" and, together with the Term Loan Collateral, the "**Prepetition Collateral**").[16]

31.      On October 17, 2017, BMO provided Rentech, Inc. with notice that the BMO Credit Agreement would not be extended beyond November 25, 2017.    The aggregate outstanding principal amount under the BMO Credit Agreement is approximately $455,000 (the "**BMO Obligations**" and, together with the Term Loan Obligations, the "**Prepetition Obligations**").    No other Letters of Credit remain outstanding.

32.      The Debtors believe that BMO is over-secured by approximately $12 million.

E.      **Proposed Asset Sales**

33.      As further discussed in Part II below, during 2015 and 2016, Rentech began to experience revenue, cash flow, and liquidity challenges due in large part to construction and operating issues with the Canadian wood pellet facilities, reduced sales for the wood pellet businesses located in the Northeastern United States operated through NEWP, and reduced demand for the wood chipping services provided by Fulghum Fibres, Inc. in the Southeastern United States.    The increasing strain on Rentech's liquidity threatened its ability to continue to service its debts under the Term Loan Credit Agreement and the BMO Credit Agreement.

34.      On April 19, 2016, Rentech, Inc. engaged Wells Fargo Securities, LLC ("**Wells Fargo**") to assist in the process of reviewing strategic alternatives to address Rentech's liquidity needs.    Specifically, Wells Fargo was retained to assist in evaluating potential transactions involving the sale, transfer, or other disposition of all or a portion of Rentech's businesses or

---

[16]      The Term Loan Agent and BMO are parties to that certain Pari Passu Intercreditor Agreement, dated as of March 2, 2015 (as amended, restated, supplemented, or otherwise modified from time to time), wherein the Term Loan Agent and BMO set forth their respective rights and remedies in respect of the Prepetition Collateral.

assets, or the equity interests in Rentech, Inc. (including a potential tender offer, merger, consolidation, other business or strategic combination, or any recapitalization).

35.     On January 30, 2017, Rentech, Inc. also retained RPA Advisors, LLC ("**RPA**" and, together with Wells Fargo, the "**Advisors**") to, among other things, validate its business plans and financial forecasts, develop restructuring proposals, and conduct discussions with creditors and stakeholders.  Since being engaged, the Advisors have (i) helped Rentech evaluate, identify, and implement initiatives designed to enhance liquidity, (ii) assisted Rentech in evaluating potential transaction alternatives and strategies and in identifying financial and/or strategic institutional investors or other investors who might have been interested in participating in a transaction, and (iii) advised Rentech as to potential mergers or acquisitions and the potential sale or other disposition of its business assets.

36.     After full consideration of Rentech's potential strategic and financial alternatives and discussions with certain potential investors, it became clear that there were no viable out-of-court refinancing or restructuring options for the Debtors to pursue.  Faced with a lack of viable financing options and dwindling liquidity, and after extensive discussions with its Advisors, Rentech determined that (i) the sale of substantially all of the assets of (a) Fulghum US, (b) NEWP, and (c) RTK WP2 Canada,[17] and (ii) the liquidation of the Wawa Facility pursuant to a receivership, combined with the Debtors' bankruptcy filing in the United States and the filing of a liquidating plan, was in the best interests of the Debtors and their creditors.

37.     Prior to the Petition Date, the Advisors conducted an extensive marketing process in an effort to locate a potential buyer for Rentech or certain of the Non-Debtor Subsidiaries. Approximately 42 potential buyers were contacted during the marketing process, approximately

---

[17]     RTK WP2 Canada owns the Atikokan Facility.

36 of which executed non-disclosure agreements and received a confidential information memorandum, and approximately 13 of which delivered an indication of interest either for Rentech or certain Non-Debtor Subsidiaries.

38.    Following substantial due diligence efforts and extensive discussions and negotiations, the Debtors and their Advisors identified potential buyers seeking to purchase substantially all of the assets of Fulghum US and NEWP (the "**Non-Debtor Subsidiary Sales**"). On December 15, 2017, Fulghum US entered into an Asset Purchase Agreement with FFI Acquisition, Inc., as the buyer, and Scott Davis Chip Company, Inc., as the affiliate guarantor of the buyer (the "**Fulghum APA**").[18]  As set forth in the Fulghum APA, FFI Acquisition, Inc. will purchase substantially all of Fulghum US's assets (aside from certain specified excluded assets) and assume substantially all of its liabilities (aside from certain deferred tax liabilities and other specified excluded liabilities).    The base purchase price under the Fulghum APA is $28,000,000.[19]  NEWP has also had substantial negotiations, which remain ongoing, regarding an agreement pursuant to which a buyer would purchase substantially all of NEWP's assets and assume substantially all of its liabilities (the "**NEWP APA**").

39.    The Debtors expect the NEWP APA to be executed in the near future and the Non-Debtor Subsidiary Sales to be consummated shortly after the Court enters an order confirming the Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation (the "**Combined Plan and Disclosure Statement**"), which is being filed concurrently herewith. Proceeds from the Non-Debtor Subsidiary Sales that are distributed by the sellers to the Debtors,

---

[18]    The proposed Non-Debtor Subsidiaries party to the Fulghum APA are Fulghum Fibres Florida, Inc., Fulghum Fibres, Inc., and Fulghum Fibres Collins, Inc.  Not all of the Fulghum US entities are party to the Fulghum APA.

[19]    The final purchase price under the Fulghum APA will include a working capital adjustment and adjustments to account for, among other things, certain excluded assets and liabilities and amounts paid into an escrow account.

the Post-Effective Date Debtors, or the Rentech Liquidation Trust as a dividend will be utilized by the Post-Effective Date Debtors or the Liquidation Trustee, as applicable, to make Distributions to the Holders of Allowed Claims and Allowed Equity Interests[20] in accordance with the absolute-priority structure set forth in the Combined Plan and Disclosure Statement. Furthermore, the Debtors also expect that the Atikokan Sale will be consummated prior to the end of 2017 and that the liquidation of the Wawa Facility will proceed concurrently and on a similar timeline as these Chapter 11 Cases.

40.    Upon the consummation of the Non-Debtor Subsidiary Sales and the Atikokan Sale, it is my understanding that, under the Combined Plan and Disclosure Statement, the Debtors expect to satisfy Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Fee Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims, and Wind-Down Expenses in full. After payment of the aforementioned Claims, all remaining funds will be distributed to Holders of General Unsecured Claims on a Pro Rata basis. I have also been informed that Holders of Allowed Affiliate Claims, Allowed Intercompany Claims, and Equity Interests will likely not receive a Distribution under the Combined Plan and Disclosure Statement.

## II.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

41.    In early 2013, Rentech made the strategic decision to shift its businesses from focusing on development and commercialization of certain alternative energy technologies to the development of a business in wood fibre processing for the production of high-quality wood chips and pellets. Through its wholly owned subsidiaries Fulghum US and Fulghum SA, which Rentech acquired in 2013, it provided wood chipping services and manufactured wood chips for

---

[20]    Capitalized terms used but not defined in this Paragraph 39 and the following Paragraph 40 shall have the meanings ascribed to such terms in the Combined Plan and Disclosure Statement.

and sold wood chips to specialty paper producers.  Through the development and operation of the Wawa Facility, Rentech sold wood pellets to Drax Power Limited ("**Drax**") for its production of power in the United Kingdom.  The Atikokan Facility sold wood pellets to Drax and Ontario Power Generation ("**OPG**") in northern Ontario Canada for power generation.  In May 2014, Rentech acquired NEWP, which sells wood chips to residential customers in the Northeastern United States.

42.     Rentech raised a substantial amount of capital through debt and equity offerings that it used to complete the acquisitions of Fulghum and NEWP, and to develop and construct the Canadian operations in Wawa and Atikokan.  One of the larger financings was provided by the Term Loan Lenders pursuant to the Term Loan Credit Agreement.

43.     The cost to develop and construct the Canadian facilities exceeded Rentech's original estimates by almost two times, and the amount of time spent constructing the Canadian facilities was substantially longer than Rentech's original estimates.  The Atikokan Facility was designed to produce approximately 110,000 metric tonnes of wood pellets per year, and although ultimately able to successfully operate at rates of approximately 90% of production capacity, the Atikokan Facility began production much later than originally planned.  The Wawa Facility was designed to produce between 400,000 to 450,000 metric tonnes of wood pellets per year, but it never successfully operated at rates of more than 40% of design capacity.

44.     RTK WP Canada and RTK WP2 Canada, which own the Wawa Facility and the Atikokan Facility, respectively, entered into take or pay contracts for the wood pellets they produced.  Those contracts, if not fulfilled, would result in substantial penalties for RTK WP Canada and RTK WP2 Canada.  Under the Drax contract (the "**Drax Contract**"), the Wawa Facility was supposed to begin delivering wood pellets in the fourth quarter of 2014.  The price

of the pellets was determined based on a formula that depended upon movement of fuel prices, fibre prices, and estimated operating costs.  The penalties were to be equal to the costs (if any) that a buyer incurred in fulfilling missed production from alternative sources.  RTK WP Canada also entered into a contract with Quebec Stevedoring Limited ("**QSL**") to reimburse QSL for the costs relating to (i) building storage for pellets that were transported to the port of Quebec and (ii) the loading and unloading of equipment.  In addition, RTK WP Canada entered into multiple contracts for the supply of fibre to the Wawa Facility.  The largest supplier was Tembec (General Partnership) ("**Tembec**").

45.     Rentech, Inc. guaranteed the obligations arising under some of the larger contracts needed for the Canadian operations, including the contracts with QSL, Canadian National Railway, Drax, OPG, and Tembec.  The total contingent obligations for Rentech, Inc. related to these guarantees is in the tens of millions of dollars.

46.     Production at the Wawa Facility never reached anything near what was required under the Drax Contract.  Further, the costs for Rentech to rectify certain design and construction problems, and to get the Wawa Facility to its design capacity, were estimated to be in excess of $20 million.  Rentech does not have the capital to continue investing in the Wawa Facility, nor is it confident that the current estimates concerning costs and the time needed to get the facility fully operational will not continue to rise.  Without the benefit of economies of scale, the price formula used in the Drax Contract led to major losses on sales of wood pellets.  The Wawa Facility will not become profitable selling wood pellets unless it is able to deliver substantially more wood pellets under the Drax Contract, and, as described above, it cannot do so because of design and construction issues.  Without a method to increase production within the limited budget that Rentech had to make improvements to the Wawa Facility, there was no way for

Rentech to deliver pellets to Drax and generate a profit. Further, the failure to deliver the contracted quantity of pellets also generated penalties in the millions of dollars for Rentech. Rentech approached Drax to discuss revisions to the pricing under the Drax Contract or for Drax to invest in the Wawa Facility, but these discussions were unsuccessful.

47.    Ultimately, in early 2017, Rentech elected to shutter the Wawa Facility. For more than a year, Rentech attempted to find buyers for the Wawa Facility, but it was unable to do so. Although Wawa has been idled, substantial carrying costs have continued to accrue, including those costs relating to certain minimum requirements for buying power and mandatory reimbursements to QSL.

48.    Rentech, Inc., as a publically traded company with multiple business units, incurs substantial selling, general, and administrative costs for maintaining accounting, finance, and legal personnel necessary to consolidate the results of multiple businesses (domestic and foreign) for public company reporting. In addition, although Rentech, Inc. initiated massive cost cutting protocols over the past approximately 18 to 24 months, as a public company, it has certain costs associated with its financial reporting. Finally, the principle balance under the Term Loan Credit Agreement continues to accrue regular interest.

49.    Although the NEWP and Fulghum businesses are self-sustaining, they are not profitable enough to generate enough cash to pay for Rentech's corporate costs and the carrying costs associated with the Wawa Facility's failure to operate. As a result of its dwindling cash position, Rentech has been forced to seek relief under chapter 11 of the Bankruptcy Code.

## PART II

50.    In furtherance of the objective of maximizing the value of its estates, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"),

and respectfully request that the Court consider entering the Proposed Orders granting such First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

51.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to Rentech's businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

## I.      ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.      Debtors' Motion for Order Under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases

52.     The Debtors seek the joint administration of their two Chapter 11 Cases for procedural purposes only.  The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in the Chapter 11 Cases will affect both of the Debtors. The failure to jointly administer these two cases would result in two individual case dockets and, I believe, inevitably lead to numerous duplicative filings for each issue, which would then be served upon separate service lists.  This duplication would be extremely wasteful and would unnecessarily overburden the Clerk of the Court and the Debtors.

## II.     BUSINESS OPERATION MOTIONS

### A.      Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345, and 363, Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business

**Forms, (II) Authorizing Continuation of Existing Deposit Practices, and (III) Approving the Continuation of Certain Ordinary Course Intercompany Transactions with the Non-Debtor Subsidiaries (the "Cash Management Motion")**

53.     In the Cash Management Motion, the Debtors seek entry of interim and final orders, pursuant to Bankruptcy Code Sections 105(a), 345, and 363, Rules 6003 and 6004, and Local Rules 2015-2 (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Cash Management Motion; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b); and (iv) approving the continuation of certain ordinary course intercompany transactions with the Non-Debtor Subsidiaries.  The Debtors also request that the Court authorize and direct the bank with which the Debtors maintain their account to continue to maintain, service, and administer such account and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

1.      **The Debtors' Cash Management System and the Bank Accounts**

54.     In the ordinary course of their businesses, the Debtors maintain a cash management system (the "**Cash Management System**") that is integral to the operation and administration of Rentech's businesses.  While the Debtors only hold one bank account in their name, the Cash Management System provides significant benefits to the Debtors, and Rentech as a whole by, among other things, enabling them to (i) monitor and control all of the Debtors' cash

receipts and disbursements, (ii) identify the cash requirements of the Debtors and the Non-Debtor Subsidiaries, (iii) transfer cash as needed to respond to the cash requirements of the Debtors and the Non-Debtor Subsidiaries, (iv) track all intercompany transfers, and (v) service the Debtors' debt obligations in the ordinary course.  The Cash Management System has been in effect since approximately 2012 and modified since such time to account for the acquisitions of Fulghum US and Fulghum SA (in 2013) and NEWP (in 2014).

55.    The Cash Management System is managed by the Debtors at their office in Los Angeles, California, where they oversee the administration of the Debtors' and Non-Debtor Subsidiaries' bank accounts to effect the collection, disbursement, and movement of cash across Rentech's corporate structure.[21]  The Debtors' oversight of the Cash Management System (as well as the cash management systems of their Non-Debtor Subsidiaries) facilitates accurate cash forecasting and reporting across Rentech, and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Account and the Non-Debtor Subsidiary Bank Accounts (as defined below).

56.    I believe that the Cash Management System is comparable to the cash management systems utilized by similarly situated holding companies to manage cash across a complex corporate structure with multiple business divisions in an efficient, cost-effective manner.  Moreover, the Cash Management System is organized in a way that respects the separate cash funding and operating needs of the Debtors and their Non-Debtor Subsidiaries.  A diagram depicting the Cash Management System, including ordinary course transfers between

---

[21]    As described in more detail in the Cash Management Motion, various divisions of Rentech's businesses (including divisions comprised exclusively of Non-Debtor Subsidiaries) manage semi-independent cash management systems which are managed on a day-to-day basis by the employees of such divisions from their local offices.  In addition, for efficiency purposes, the Debtors' accounts payable department is located at the headquarters of their Non-Debtor Subsidiary, NEWP, and, therefore, checks written by the Debtors originate from NEWP's offices but are drawn from the Debtor Bank Account (as defined below).

the Debtors and Non-Debtor Subsidiaries, is attached to the Cash Management Motion as
Attachment 1.   As shown therein, Rentech's operations (and cash management structure)
effectively consist of segments relating to: (1) NEWP; (2) Fulghum US; (3) Fulghum SA; (4)
Rentech Canada; and (5) Rentech US.   Each of NEWP, Fulghum US, Fulghum SA, and Rentech
Canada[22] manage their cash independently, while Rentech, Inc. manages the cash needs of
Rentech US and oversees the consolidated system, as described in greater detail below.

57.   As of the Petition Date, the Debtors maintain only one (1) bank account
(the "**Debtor Bank Account**"), which is held in the name of Rentech, Inc., and the Debtors'
Non-Debtor Subsidiaries maintain approximately 80 bank accounts (the "**Non-Debtor
Subsidiary Bank Accounts**" and, together with the Debtor Bank Account, the "**Bank
Accounts**").   The Debtor Bank Account is held in the United States at BMO Harris Bank
(the "**Bank**"), which is a member of the Federal Deposit Insurance Corporation ("**FDIC**")[23] and
has executed the approved Uniform Depository Agreement with the U.S. Trustee.   All funds in
the Debtor Bank Account are denominated in U.S. Dollars.

58.   The Non-Debtor Subsidiary Bank Accounts are located across United States,
Canada, Luxembourg, Chile, and Uruguay, and the funds in such accounts are denominated in
either U.S. Dollars or the local currency.   More specifically, the Non-Debtor Subsidiary Bank
Accounts consist of:

- NEWP:

    - Three (3) bank accounts in the United States at TD Bank N.A.
      (collectively, the "**NEWP Bank Accounts**").

---

[22]     While Rentech Canada is generally responsible for the day-to-day oversight of its cash management
system, the consent of Rentech, Inc. is required for larger disbursements.

[23]     As a result, the Debtors' funds are insured by the federal government of the United States (up to applicable
FDIC limits).

- Fulghum US:

  o Twenty-four (24) bank accounts in the United States at Regions Bank;
  o Two (2) bank accounts at Queensborough National; and
  o One (1) bank account at Bank of America (collectively, the "**Fulghum US Bank Accounts**").

- Fulghum SA:

  o Five (5) bank accounts in Chile at Banco Credito Inversiones;
  o Three (3) bank accounts in Chile at Banco Bice;
  o Five (5) bank accounts in Chile at Banco Security;
  o Six (6) bank accounts in Chile and Uruguay at Banco Santander;
  o Four (4) bank accounts in Chile at Banco Itau;
  o Five (5) bank accounts in Chile at Scotiabank;
  o Four (4) bank accounts in Chile at Banco Chile;
  o Two (2) bank accounts in Chile at Banco Estado; and
  o Two (2) bank accounts in Chile at BBVA (collectively, the "**Fulghum SA Bank Accounts**").

- Rentech Canada:

  o Nine (9) bank accounts in Canada at Bank of Montreal (the "**BMO Bank Accounts**"); and
  o One (1) bank account in Luxembourg at ING Luxembourg (the "**Luxembourg Bank Account**" and, together with the BMO Bank Accounts, the "**Rentech Canada Bank Accounts**").

- Rentech US:

  o Four (4) bank accounts in the U.S. at BMO Harris Bank; and
  o One (1) bank account in the U.S. at BNY Mellon (collectively, the "**Rentech US Bank Accounts**").[24]

59.    Schedules of the Bank Accounts are attached to the Cash Management Motion as Attachment 2.[25]  As reflected in Attachment 2, the Non-Debtor Subsidiary Bank Accounts are held in the names of approximately 24 different Non-Debtor Subsidiaries.

---

[24]    The bank account at BNY Mellon is an escrow account in the name of Rentech Nitrogen (the "**Escrow Account**").

As noted above in Part I, the sale agreement related to the RNP transaction requires a milestone payment to be made to former RNP unitholders equal to 50% of the facility's EBITDA, in excess of $8.0 million cumulatively earned over the two year period ending on March 31, 2018.  As of the Petition Date, any rights to such earn-out proceeds will be deposited into the Escrow Account.

60.     As illustrated on Attachment 1 to the Cash Management Motion, the Debtor Bank Account is a general collection account and is used for receiving and disbursing all of the Debtors' cash.  The Debtors do not maintain a separate investment account, and any funds in the Debtor Bank Account earn interest in the form of credits that offset any fees and charges of the Bank.  As of the Petition Date, the aggregate amount held in the Debtor Bank Account is approximately $2,969,456.11.

### 2.     The Debtors' Cash Collection and Disbursement Process

61.     Rentech's primary source of funds is revenue from its three business segments: (i) contract wood handling and chipping services, (ii) the manufacture and sale of wood pellets for the U.S. heating market, and (iii) the manufacture, aggregation, and sale of wood pellets for the utility and industrial power generation market.  Cash generated from such sources by the Non-Debtor Subsidiaries is initially collected into the applicable Non-Debtor Subsidiary Bank Accounts.  With the exception of Rentech US, the other segments of Rentech use the cash generated from their operations to pay their overhead and operating expenses (including payroll). Any funds remaining in the Non-Debtor Subsidiary Accounts after paying the expenses of the applicable Non-Debtor Subsidiary generally remain within such Non-Debtor Subsidiary Accounts, unless they are upstreamed to the Debtor Bank Account, as described below.

### a.     Transfers under the Term Loan Credit Agreement

62.     Pursuant to Section 2.05 of the Term Loan Credit Agreement, proceeds from an Extraordinary Proceeds Event (as defined in the Term Loan Credit Agreement, and which includes any Asset Sale (as defined in the Term Loan Credit Agreement)) must be offered to

---

[25]     The Debtors believe, and have undertaken reasonable efforts to ensure, that Attachment 1 and Attachment 2 to the Cash Management Motion list all of the bank accounts that comprise the Debtors' Cash Management System. In the event that any bank account has been inadvertently omitted from Attachment 1 or Attachment 2, the Debtors are requesting that the relief sought by the Cash Management Motion be deemed to apply to such account.

prepay the Loans (as defined in the Term Loan Credit Agreement).  Upon the occurrence of an Extraordinary Proceeds Event,[26] funds are transferred by wire from the applicable entity to Rentech, Inc., and subsequently downstreamed to Rentech Nitrogen for disbursement to the Term Loan Lenders.  It is my understanding that in 2017, principal, interest, and/or fee payments on account of these obligations were made seven (7) times, most recently on November 9, 2017, and while the amount of such payments can fluctuate significantly, the average payment made in 2017 was approximately $2,000,000.00.

63.     In addition, Rentech Nitrogen pays (i) principal payments from time to time, (ii) quarterly interest payments, and (iii) an annual administrative fee to the Term Loan Agent, each pursuant to the Term Loan Credit Agreement.  Cash generated from operations at the Non-Debtor Subsidiaries is occasionally transferred by wire to Rentech, Inc., when excess funds are available at the applicable Non-Debtor Subsidiary and/or upon request by Rentech, Inc.  Such funds are downstreamed from time to time to Rentech Nitrogen for disbursement to the Term Loan Lenders and the Term Loan Agent, as applicable, at the discretion of Rentech, Inc. and generally in accordance with the Term Loan Credit Agreement.  It is my understanding that in 2017, cash payments on account of principal totaled $10,309,610.04, interest payments totaled $3,164,286.85, and an administrative fee of $50,000.00 was paid in accordance with the Term Loan Credit Agreement.[27]

---

[26]     An "Extraordinary Proceeds Event" includes any disposition of property or assets of Rentech, Inc. or its subsidiaries, subject to certain limited carve-outs, as well as the consummation of any transaction relating to the Specific Property (as defined in the Term Loan Credit Agreement, and which includes fixed or capital assets (i) owned by Fulghum Graanul Oliver, LLC in Screven County, Georgia, (ii) owned by any subsidiary of Rentech, Inc. and designated as "Project Yankee," or (iii) owned by RTK WP Canada in Wawa, Ontario, Canada or RTK WP2 Canada in Atikokan, Ontario, Canada).

[27]     In addition, in November 2017, Rentech Nitrogen (i) paid a fee of $104,850.97 in connection with executing a certain waiver agreement under the Term Loan Credit Agreement and (ii) exchanged 7,187,630 units of CVR for a reduction of the outstanding Loans under the Term Loan Credit Agreement in the principal amount of $22,396,682.35.

b.    **Transactions with NEWP**

64.    NEWP maintains an independent cash management system and, in the ordinary course of business, collects cash receipts and makes disbursements without any funds flowing through the Debtor Bank Account.[28]    However, Rentech, Inc. and NEWP share in the provision of certain corporate services, including, without limitation, the payment of salaries, the provision of certain benefits for shared employees, and the maintenance of appropriate insurance coverage[29] (collectively, the "**Shared Services**").    The entity or entities providing or paying for such Shared Services invoice the benefitting entity or entities at the end of each month, and payments on account of the Shared Services are generally transferred between the Debtor Bank Account and the NEWP Bank Accounts, as applicable, within 30 days.    Over the prior six months, the average monthly amount paid by NEWP to Rentech, Inc. on account of such Shared Services was approximately $74,350.00.    As of the Petition Date, I believe that NEWP owed approximately $124.16 to Rentech, Inc. on account of accrued and unpaid Shared Services.

c.    **Transactions with Fulghum US**

65.    Similar to the transactions between Rentech, Inc. and NEWP, Rentech, Inc. and Fulghum US also share in the provision of certain corporate services.    At the end of each month, the entity to whom funds are owed on account of such Shared Services issues an invoice, which is generally paid within 30 days.    Over the prior six months, the average monthly amount paid by Fulghum US to Rentech, Inc. on account of such Shared Services was approximately $354,424.00.    As of the Petition Date, I believe that Fulghum US did not owe any amounts to Rentech, Inc. on account of accrued and unpaid Shared Services.

---

[28]    More specifically, the NEWP Bank Accounts consist of an operating account, a payroll account, and an investment account.

[29]    The Insurance Motion (as defined below) provides additional details regarding the insurance policies maintained by the Debtors and the Non-Debtor Subsidiaries.

d.    **Transactions with Fulghum SA**

66.    Rentech, Inc. has historically provided certain corporate services to Fulghum SA, for which Fulghum SA is generally invoiced on a monthly basis.  More specifically, Rentech, Inc. has historically (i) employed one (1) employee[30] that has devoted a majority of his or her time to the business of Fulghum SA, and (ii) paid the upfront costs of insurance coverage for Fulghum SA.  The Debtors intend to continue such arrangement postpetition for so long as Fulghum SA remains part of the Rentech corporate family.  Over the prior six months, the average monthly amount paid by Fulghum SA to Rentech, Inc. on account of such services was approximately $66,127.00.  As of the Petition Date, I believe that Fulghum SA owed approximately $28,136.00 to Rentech, Inc. on account of accrued and unpaid corporate services.

e.    **Transactions with Rentech Canada**

67.    Rentech Canada, through the Non-Debtor Subsidiary RTK WP Dev Canada, ULC, currently has two (2) employees that support its operations.  Rentech, Inc. has historically contributed to the funding of payroll for such employees to ensure uninterrupted operations at Rentech Canada and preserve the value of the consolidated Rentech enterprise and the Debtors.  Over the prior six months, the average monthly amount paid by Rentech, Inc. to RTK WP Dev Canada, ULC on account of payroll was approximately $4,480.00.[31]  The Debtors seek authority, in their sole discretion, to continue to make payments (principally on account of payroll) in the ordinary course of business to Rentech Canada postpetition if the Debtors determine that it is in the best interests of their estates to protect the consolidated value of the enterprise.

---

[30]    The employee has the title of Marketing Director, Asia Pacific.

[31]    Over the prior six months, the Debtors made two payments to RTK WP Dev Canada, ULC: (i) $19,082.51 on June 13, 2017 and (ii) $7,780.89 on July 5, 2017.

68.    In addition, from time to time, Rentech, Inc. funds Rentech Luxembourg, the parent of many of Rentech's Canadian entities, in an amount sufficient to cover maintenance fees, services fees, and local taxes.  On an annual basis, Rentech, Inc. disburses approximately $50,000.00 to maintain the Luxembourg Bank Account.[32]  The Debtors intend to wind down Rentech Luxembourg postpetition and close the Luxembourg Bank Account.

<div align="center">f.    <b>Transactions with Rentech US</b></div>

69.    The Rentech US Bank Accounts are all zero balance accounts.  Funds received by the Rentech US Bank Accounts are automatically swept at the end of each business day into the Debtor Bank Account.  As noted above, cash in the Debtor Bank Account is then used to satisfy any obligations set forth above or for general corporate purposes of the Debtors.

<div align="center">3.    <b>Continued Use of the Debtors' Cash Management System and the Debtor Bank Account</b></div>

70.    I believe that the Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to Rentech's business operations during the Chapter 11 Cases and the Debtors' goal of maximizing value for the benefit of all parties in interest.  The Debtors' filed these Chapter 11 Cases with the goal of implementing a liquidating plan that will provide for an absolute priority distribution to be effectuated by a sale of the assets of certain of the Non-Debtor Subsidiaries.  As such, the Debtors do not expect that they will remain a going concern and further expect that these Chapter 11 Cases will be concluded in short order.  Accordingly, I believe that to require the Debtors to adopt a new cash management system would be expensive, impose needless administrative burdens, and cause undue disruption, all with little benefit.  The Cash Management System, provides a valuable and efficient means for the Debtors (and the Non-Debtor Subsidiaries) to

---

[32]    The last payment made by Rentech, Inc. to Rentech Luxembourg was on March 13, 2017 in the amount of $22,547.91.

<div align="center">29</div>

address their cash management requirements, and any disruption thereto would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value and repay their creditors.  Furthermore, to the best of the Debtors' knowledge, the Debtor Bank Account is held at a financially stable institution insured in the United States by the FDIC, which has also executed the approved Uniform Depositary Agreement.  For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, the Non-Debtor Subsidiaries, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Account.

71.     As part of the relief requested in the Cash Management Motion, and to ensure that their transition into chapter 11 is as smooth as possible, the Debtors seek an order authorizing the Debtors to (i) maintain and continue to use the Debtor Bank Account, including but not limited to the account listed on <u>Attachment 2</u> to the Cash Management Motion, in the same manner and with the same account number, styles, and document forms as are currently employed; (ii) deposit funds in and withdraw funds from the Debtor Bank Account in the ordinary course (including, without limitation, sending funds to and receiving funds from the Non-Debtor Subsidiary Bank Accounts) by all usual means, including checks, wire transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the Debtor Bank Account; (iii) pay ordinary course bank fees in connection with the Debtor Bank Account, including prepetition fees; (iv) perform their obligations under the documents and agreements governing the Debtor Bank Account; and (v) for all purposes, treat the Debtor Bank Account as an account of the Debtors in their capacities as debtors in possession.

72.     If the relief requested in the Cash Management Motion is granted, I have been informed that the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by the Court.  To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, the Debtors will work closely with the Bank to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being honored absent the Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.

73.     In the Cash Management Motion, the Debtors also request that if the Bank honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error, that the Bank be deemed not liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. I believe that such flexibility accorded the Bank is necessary to induce the Bank to continue providing cash management services to the Debtors.

74.     In the Cash Management Motion, the Debtors further request that the Bank be authorized to deduct from the appropriate Debtor Bank Account the Bank's fees and expenses, if any, and to the extent not credited as described therein (the "**Bank Fees and Expenses**"), and that no liens on any Debtor Bank Account take priority over the Bank Fees and Expenses, except as set forth in any deposit agreements between the Debtors and the Bank.

75.     Additionally, because the Debtor Bank Account is held at a bank that is a party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of an interim or final order granting the Cash Management Motion, the Debtors will (i) contact the Bank, (ii) provide the Bank with the Debtors' employer identification numbers, and (iii) identify its account as held by a debtor in possession in a bankruptcy case.

76.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Cases, the Debtors request that the Bank be authorized and directed to continue to administer, service, and maintain the Debtor Bank Account as such account was administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses), and, when requested by the Debtors in their sole discretion, to honor any and all checks, drafts, wires, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Account on account of a claim against the Debtors arising on or after the Petition Date.

77.     The Debtors further request that they be authorized to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing the Debtor Bank Account and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtors deem that such accounts are needed or appropriate and whether or not the banks at which the accounts are opened are designated approved depositories in the District of Delaware.  I understand that, notwithstanding the foregoing, any New Accounts that the Debtors open will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement, and any New Account that the Debtors open

in the United States will be (x) at the Bank or with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (y) designated a "Debtor in Possession" account by the relevant bank.  The Debtors request that the relief sought by the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to be Debtor Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  I understand that the Debtors will provide the U.S. Trustee with prompt notice of the closing of the Debtor Bank Account and the opening of any New Accounts.  In furtherance of the foregoing, the Debtors also request that the relevant banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

### 4.    Continued Use of the Debtors' Existing Checks and Business Forms

78.    To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; *provided*, *however*, that in the event the Debtors generate new checks during the pendency of the Chapter 11 Cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession."  The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.[33]

---

[33]    Although the operating guidelines established for debtors in possession by the U.S. Trustee would require the Debtors to obtain and use new checks bearing the "Debtor in Possession" designation, I do not believe that such guidelines impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek explicit authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

79.     I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

5.     **Waiver of Certain Requirements of the U.S. Trustee**

80.     The Debtors further request, pursuant to Bankruptcy Code Sections 105(a) and 363, that the Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under the Cash Management System or (ii) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.

81.     I understand that in order to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession.  I have been informed that these requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear (a) the designation "Debtor In Possession," (b) the bankruptcy case number, and (c) the type of account. It is my understanding that the UST Requirements are designed to demarcate clearly prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims.  As noted previously, I believe that (i) the

34

Debtors will be able to work with the Bank to ensure that this goal of separation between the prepetition and postpetition periods is observed and (ii) enforcement of certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

82.    I believe it would be onerous, unnecessarily inconvenient, and fail to produce any realizable benefits to the estates to require the Debtors to close their existing bank account and open a new debtor in possession account.

83.    Further, it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  I believe that the Debtors can pay their tax obligations most efficiently from their existing collection account in accordance with their existing practices, and the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such accounts.  The creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

84.    In addition, I believe that it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral.  As set forth in the Cash Collateral Motion (as defined below), the Term Loan Lenders have consented to the use of Cash Collateral (as defined below), and the Debtors have provided significant safeguards (negotiated in good faith with parties in interest) to ensure that parties with security interests in the Debtors' Cash Collateral are adequately protected and that such parties have been provided with notice of the proposed use of such Cash Collateral.

6.    **Continued Deposit Practices**

85.    As part of the Cash Management System, the Debtors routinely deposit funds into the Bank Account (the "**Deposit Practices**").  In the Cash Management Motion, the Debtors request (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of Bankruptcy Code Section 345(b), on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent the Bank Account may be classified as an investment account, or to the extent any of the Debtors' routine deposits into the Bank Account may be regarded as investment activity, the Debtors seek authorization to continue to deposit funds into such Bank Account in accordance with existing practices, notwithstanding the requirements of Bankruptcy Code Section 345(b).

7.    **Authorization to Maintain and Continue Ordinary Course Intercompany Transactions**

86.    As noted above, all of the revenue of the consolidated Rentech enterprise is generated by the Non-Debtor Subsidiaries.  In the ordinary course, cash is transferred from Non-Debtor Subsidiary Bank Accounts to the Debtor Bank Account, or vice versa, for the payment of expenses and operating costs (the "**Intercompany Transactions**").  All such deposits and payments are reflected on the books and records of the Debtors.  As a result, the Debtors' books and records reflect prepetition obligations among the Debtors and their Non-Debtor Subsidiaries.

87.    By the Cash Management Motion, the Debtors seek authority to pay for or otherwise reconcile prepetition Intercompany Transactions if the Debtors, in their sole discretion, deem such payment or reconciliation necessary and in the best interests of the Debtors' estates and other parties in interest.  Additionally, the Debtors seek authority, in their sole discretion, to

set off prepetition obligations arising out of the Intercompany Transactions.  Finally, the Debtors

seek authority, in their sole discretion, to continue to engage in Intercompany Transactions

postpetition in the ordinary course of business.

88.     The Debtors maintain records of all fund transfers and can ascertain, trace, and

account for Intercompany Transactions.  I believe that if the Intercompany Transactions were to

be discontinued, the Cash Management System and the related administrative controls would be

disrupted to the Debtors' detriment, because the Debtors would be unable to satisfy their

obligations as they come due.

**B.     Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (A) Pay Prepetition Insurance Obligations and Maintain Postpetition Insurance Coverage, (B) Continue to Honor the Insurance Premium Finance Agreements, (C) Continue to Grant Security Interests to the Insurance Premium Finance Company, (D) to Continue to Honor Surety Bond Obligations, and (E) Authorize Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "<u>Insurance Motion</u>")**

89.     In the Insurance Motion, the Debtors request entry of an order authorizing the

Debtors to (a) continue and renew the Insurance Policies (as defined below), or obtain new

insurance policies, as  needed in the ordinary course of business, (b) honor all of their prepetition

and postpetition obligations, including payment of all outstanding prepetition Insurance

Obligations (as defined below), under and in connection with the Insurance Policies on an

uninterrupted basis and in accordance with the same practices and procedures as were in effect

before the Petition Date, including premiums and fees arising under the Insurance Policies and

the Broker Commissions (as defined below), (c) continue honoring obligations pursuant to the

Finance Agreements entered into with the Insurance Premium Finance Company (each as

defined below) for the purpose of financing the purchase of certain forms of insurance coverage,

(d) continue the grants of the IPFC Security Interests (as defined below) for the Debtors'

performance of their obligations under the Finance Agreements, and (e) continue honoring obligations relating to the Surety Bond (as defined below).

90.     The Debtors also seek entry of an order authorizing the Debtors' banks and other financial institutions to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion.

1.     **The Debtor's Insurance Policies**

91.     As described in the Insurance Motion, in the ordinary course of their businesses, the Debtors maintain numerous insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, general liability, property, business automobile, umbrella and excess liability, site pollution incident legal liability, commercial crime, special crime, director and officer liability, fiduciary liability, attorney and legal liability, foreign liability, employment practices liability, and workers' compensation claims[34] (collectively, "**Insurance Policies**"), as summarized in Exhibit B to the Insurance Motion.  The Insurance Policies cover Rentech, Inc. and the Non-Debtors Subsidiaries.  Rentech, Inc. pays the annual premiums (plus all associated taxes and fees) relating to the Insurance Policies, and then each Non-Debtor Subsidiary reimburses Rentech, Inc. for its *pro rata* portion of the premiums, taxes, and fees for those Insurance Policies to which they are a party.

92.     The annual amount paid by Rentech, Inc. on account of the Insurance Policies totals approximately $2,527,000,[35] which amount includes the premiums associated with the

---

[34]     The Debtors are separately seeking authorization to honor payments on account of claims covered by their workers' compensation policy as part of the Employee Wage and Benefits Motion (as defined below).

[35]     Of this figure, approximately $1,712,900 relates to amounts owed under the Finance Agreements between Rentech, Inc. and the Insurance Premium Finance Company.  As set forth in further detail on Exhibit D to the Insurance Motion, the following Insurance Policies are covered under the Finance Agreements: (1) Global Property Policy; (2) Auto Policy; (3) General Liability Policies; (4) Crime Insurance Policy; (5) Fiduciary Liability Policy;

Insurance Policies, Broker Commissions, certain down payments associated with the Finance Agreements, and other related fees and costs (collectively, the "**Insurance Obligations**").  The Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

93.    Of the approximately $1,669,000 that has been paid on account of the Insurance Obligations,[36] the Non-Debtor Subsidiaries have reimbursed Rentech, Inc. approximately $826,000.  It is my understanding that the Non-Debtor Subsidiaries will continue to make additional reimbursement payments on account of the Insurance Policies to Rentech, Inc. during the Chapter 11 Cases in the ordinary course of business.  Of the approximately $2,527,000 in total premiums associated with the Insurance Policies, Rentech, Inc. expects to receive a total of approximately $1,679,000 in reimbursements from the Non-Debtor Subsidiaries.

94.    As set forth in the Insurance Motion, and more fully described therein, Rentech, Inc. maintains third-party Insurance Policies through various insurance companies.  The Insurance Policies are essential to the ongoing operation of the Debtors' and the Non-Debtor Subsidiaries' businesses.  In many cases, the coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' and Non-Debtor Subsidiaries' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' and Non-Debtor Subsidiaries' business operations.

95.    The Debtors employ Marsh Risk & Insurance Services (the "**Broker**") to assist them with the procurement and negotiation of the Insurance Policies.  The Broker provides services to and receives compensation (the "**Broker Commissions**") from the Debtors for such

---

(6) Excess Liability Policies; (7) Site Pollution Policy; (8) International Liability Policies; and (9) Workers' Compensation Policies.

[36]      Although certain of the Insurance Policies date back several years, a substantial majority of the $1,669,000 paid on account of the Insurance Obligations has been paid in the last twelve months.

services.   The Broker is compensated based on a disclosed percentage of the insurance premiums, which is approximately 5% for those premiums related to the U.S. Non-Debtor Subsidiaries, and 10% for those premiums related to the non-U.S. Non-Debtor Subsidiaries.  The Broker Commissions, which are included in the premium amounts, are paid by Rentech, Inc. as Insurance Policy premiums are paid.   I understand that as of the Petition Date, all Broker Commissions that were due and owing have been paid in the ordinary course of business.

## 2.   Prepetition Insurance Premium Finance Agreements

96.   Rentech, Inc. maintains several insurance premium finance agreements (collectively, the "**Finance Agreements**") with AFCO Credit Corp. (including any affiliates or subsidiaries, the "**Insurance Premium Finance Company**" or "**AFCO**"), copies of which are annexed to the Insurance Motion as Exhibit C.   Pursuant to the Finance Agreements, AFCO agreed to pay the insurance premiums due under those Insurance Policies set forth on Exhibit D to the Insurance Motion, in exchange for down payments and installment payments totaling approximately $2,156,739.90 from Rentech, Inc. and certain Non-Debtor Subsidiaries. [37] [38]   As of the Petition Date, the Debtors' remaining obligations under the Finance Agreements total approximately $858,000, of which, approximately $853,000, once paid by Rentech, Inc., will be reimbursed to Rentech, Inc. by certain of the Non-Debtor Subsidiaries.  The Debtors' obligation to pay AFCO under the Finance Agreements is secured by grants to AFCO of security interests in any and all unearned premiums and dividends that may become payable under the covered

---

[37]    Of the $2,156,739.90 due under the Finance Agreements, Rentech, Inc. has paid or will pay approximately $1,712,900, of which $1,679,000, has been or will be reimbursed to Rentech, Inc. by certain of the Non-Debtor Subsidiaries.

[38]    The down payments and installment payments under the Finance Agreements total approximately $494,822 and $1,661,917.90, respectively.   The number of installment payments vary from 8-11 depending on the Financing Agreement, and the amount of each payment ranges from $8,040.64 to $119,045.36.   A further breakdown of the down payments and installment payments for the Insurance Policies covered by the Finance Agreement is included on Exhibit D to the Insurance Motion.

Insurance Policies, loss payments that reduce the unearned premiums (subject to any mortgagee or loss payee interests), and any interest in any state guarantee fund relating to the covered Insurance Policies (such security interests, the "**IPFC Security Interests**").

97.    I believe that the Insurance Policies subject to the Finance Agreements, which are set forth on Exhibit D to the Insurance Motion, are essential to the preservation of the Debtors' and the covered Non-Debtor Subsidiaries' businesses, properties, and assets.  In the Debtors' business judgment, the terms of the Finance Agreements represent the best possible terms for financing the premiums of the Insurance Policies.  The Debtors' estates will benefit by maintaining this low-cost financing from the Insurance Premium Finance Company.  Moreover, any interruption of payments might adversely affect the Debtors' and the covered Non-Debtor Subsidiaries' ability to obtain financing for future policies on favorable terms.  In some cases, the coverage is required by regulations, laws, and/or contracts that govern the Debtors' or the covered Non-Debtor Subsidiaries' obligations.

98.    Further, I believe that the ordinary course maintenance of the Debtors' insurance financing programs, including payment of all monthly obligations under the Finance Agreements, and the renewal of or entry into new financing arrangements as may be required as the annual terms of existing arrangements expire and consistent with prepetition practice, without further order of the Court, is also necessary and essential to the Debtors' and the Non-Debtor Subsidiaries' operations and achievement of their chapter 11 objectives, especially where, as here, the Debtors' failure to pay their monthly premium obligations to the Insurance Premium Finance Company could have disastrous consequences for the Debtors and the Non-Debtor Subsidiaries.

99.     Specifically, under the terms of the Finance Agreements, the Insurance Premium Finance Company may issue a delinquency charge upon a late payment of any installments. Moreover, the Insurance Premium Finance Company may cancel the insurance policies under the Finance Agreements and issue a cancellation charge.   Because the Debtors are required to maintain insurance coverage during the Chapter 11 Cases, the cancellation of these policies would be particularly costly.   Even if the Insurance Premium Finance Company did not immediately cancel the insurance coverage upon the Debtors' default, the Debtors' failure to pay monthly premium obligations would result in a depletion of the unearned premiums.

### 3.     The Surety Bond

100.     Rentech, Inc. has certain indemnification obligations under that certain Indemnity Agreement, dated as of April 28, 2016 (the "**Indemnity Agreement**"), relating to that certain surety bond, dated as of April 28, 2016 (the "**Surety Bond**"), by and among Fulghum Fibres, Inc., as the principal, Virginia Electric & Power Company ("**Virginia Electric**"), as the obligee, and Liberty Mutual Insurance Company ("**Liberty Mutual**"), as the surety.   Under the terms of the Surety Bond, Liberty Mutual issued a $47,850 bond to guarantee that Fulghum Fibres, Inc. will satisfy its obligations to Virginia Electric.   If Fulghum Fibres, Inc. fails to fulfill its obligations and Virginia Electric draws on the Surety Bond, then Fulghum Fibres, Inc. and Rentech, Inc., as an indemnifying party under the Indemnity Agreement, would be obligated to pay up to $47,850 to Liberty Mutual.   Under the terms of the Surety Bond, Fulghum Fibres, Inc. is also obligated to pay Liberty Mutual approximately $1,675.00 in annual premiums.   Under the terms of Indemnity Agreement, Rentech, Inc. is also obligated to pay Liberty Mutual on account of the annual premiums relating to the Surety Bond.

101.     As of the Petition Date, there are no amounts outstanding related to Fulghum Fibres, Inc.'s obligations under the Surety Bond or Rentech, Inc.'s obligations under the

Indemnity Agreement.  In the Insurance Motion, the Debtors seek authority, but not direction, to continue honoring Rentech, Inc.'s obligations under the Indemnity Agreement relating to the Surety Bond.

102.    I believe that the ordinary course satisfaction of the Debtors' obligations relating to the Surety Bond under applicable law, without further order of the Court, is necessary and essential to the operation of the Non-Debtor Subsidiaries' businesses.  Failure to satisfy such obligations could result in significant and costly disruptions in the Non-Debtor Subsidiaries' operations, which would severely and negatively impact the value of the Debtors' estates for all stakeholders.

103.    Accordingly, for the reasons set forth herein and in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, the Non-Debtor Subsidiaries, and all other parties in interest, and will enable the Debtors and the Non-Debtor Subsidiaries to continue to operate their business in compliance with contractual and regulatory requirements and to safeguard the value of their estates.

    **C.**    **Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8), 541, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Prepetition Taxes and Fees, and (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Tax Motion")**

104.    In the Tax Motion, the Debtors seek entry of an order pursuant to Bankruptcy Code Sections 105(a), 363(b), 506(a), 507(a)(8), 541, 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004, (i) authorizing, but not directing, them to pay, in their sole discretion, but subject to the terms and provisions of any cash collateral and/or postpetition financing agreement made by the Debtors or order entered by the Court, any prepetition tax and fee obligations including, without limitation, sales and use taxes, franchise taxes, personal property taxes, any other types

of taxes, fees, or similar charges, and any penalty, interest, or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**")[39] owing to those federal, state, provincial, and local governmental entities in the United States, including those entities listed on <u>Exhibit B</u> to the Tax Motion (the "**Taxing Authorities**"), and (ii) authorizing the Debtors' banks and other financial institutions to honor and process check and electronic transfer requests related thereto.  It is my understanding that the Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Tax Motion to $50,000 unless further authorization is obtained from the Court.

105.    For the avoidance of doubt, it is my understanding that the requested authorization (i) would be discretionary, allowing the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors, before other Taxes and Fees, (ii) would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate, and (iii) would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.

106.    In addition, the Debtors request that the Court authorize the Debtors' banks and other financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtors' banks and other financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

---

[39]    Payroll, withholding, and other employee-related tax obligations are separately addressed in the Employee Wage and Benefits Motion.

107.    As set forth in the Tax Motion, it is my understanding that the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the personal liability theory or the doctrine of necessity.  I believe that by paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtors will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes—over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

108.    Prior to the Petition Date, the Debtors incurred obligations to federal, state, provincial, and local governments in the United States.  Although, as of the Petition Date, I believe the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due.[40]

109.    I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates.  It is my understanding that, if such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured, or unsecured in nature, (b) the obligations are proratable or fully prepetition or postpetition, and (c) penalties, interest, attorneys' fees, and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

---

[40]    In 2016, the Debtors paid approximately $5,645,420 on account of Taxes and Fees.

110.    Moreover, I have been advised that certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

111.    I have been informed that certain of the Taxing Authorities may not have been paid or may have been sent checks and/or fund transfers for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis. Accordingly, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers issued by the Debtors to the Taxing Authorities in payment of Taxes and Fees that had not been honored and paid as of the Petition Date, and authorizing the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**D.      Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2 and (IV) Granting Related Relief (the "Cash Collateral Motion")**

112.    In the Cash Collateral Motion, the Debtors request that the Court enter the Cash Collateral Orders: (a) authorizing the Debtors to use Cash Collateral as requested therein; (b) granting certain adequate protection to the Prepetition Lenders to secure the Prepetition Liens in connection with the Debtors' use of Cash Collateral in which the Prepetition Lenders have an

interest, and any diminution in value of the Prepetition Lenders' interest in the Prepetition Collateral; provided that the proposed adequate protection shall be subject and subordinate in all respects only to the Carve-Out; (c) pursuant to Bankruptcy Rule 4001, scheduling the Final Hearing to be held within thirty (30) days of the Petition Date to consider entry of the Final Order; and (d) granting related relief.

113.   If the Cash Collateral Motion is not approved and the Debtors do not obtain authorization to use the Cash Collateral, I believe that the Debtors, their creditors, and their estates generally will suffer immediate and irreparable harm.   The consummation of the Non-Debtor Subsidiary Sales is dependent on a smooth transition into, and swift exit from, chapter 11. Given the Debtors' current liquidity position, the relief requested in the Cash Collateral Motion is crucial to ensure Rentech's operations continue as usual while the Non-Debtor Subsidiary Sales and the Atikokan Sale are finalized.   Without approval of the Cash Collateral Motion and authorization to use the Cash Collateral, there will be a substantial risk that the Non-Debtor Subsidiary Sales and/or the Atikokan Sale will be disrupted.   Without the use of the Cash Collateral, I believe that the Debtors will not have the liquidity necessary to maintain operations at Rentech through the pendency of these Chapter 11 Cases, which could impact the ability of the Debtors to consummate the Non-Debtor Subsidiary Sales, which the Debtors are relying upon in order to be able to able to make distributions to Holders of Allowed Claims, as provided for in, and subject to, the Combined Plan and Disclosure Statement.

114.   I believe that it is vital to the success of the Debtors' liquidation efforts that they immediately obtain access to Cash Collateral.   The Debtors' ability to consummate the Non-Debtor Subsidiary Sales depends heavily upon the expeditious approval of the use of Cash Collateral for general working capital purposes.   Absent the Court's approval of the interim and

final relief sought in the Cash Collateral Motion, it is my understanding that the Debtors face a substantial risk of severe disruption to their operations, which would in turn cause immediate and irreparable damage to the Debtors' estates should either of the prospective purchasers decide not to move forward with the Non-Debtor Subsidiary Sales.

115.    The Debtors' request for use of Cash Collateral is limited to budgeted expenses reasonably calculated to maximize the value of the Debtors' assets and the realization on the Prepetition Collateral.

116.    It is my understanding, that the Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seek to use Cash Collateral existing on or after the Petition Date to pay operating expenses as enumerated in the Budget (as defined below).   Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors, including, without limitation, a significant risk that the Non-Debtor Subsidiary Sales and/or the Atikokan Sale will not be consummated.

117.    The Debtors, with the assistance of their financial advisors, have prepared a budget, a copy of which is attached to the Cash Collateral Motion as Exhibit A (the "**Budget**"), which shows, *inter alia*, the Debtors' forecasted receipts and disbursements from the Petition Date through February 2, 2018.  Under the Budget, the Debtors intend to use Cash Collateral in the same way the Debtors used cash prepetition in the ordinary course of business, including, among other things, (i) to pay payroll expenses; (ii) as working capital; (iii) for other general corporate purposes; and (iv) to satisfy administrative expense claims pursuant to the Combined Plan and Disclosure Statement.

118.    Absent the entry of the Cash Collateral Orders permitting the Debtors to use Cash Collateral to make disbursements under the Budget, it is my understanding that the Debtors will have insufficient funds available to operate their businesses, administer the Chapter 11 Cases, and coordinate the Non-Debtor Subsidiary Sales, thereby dissipating value to the detriment of the Prepetition Lenders and all other stakeholders.

119.    I believe that the terms and conditions of the Debtors' use of the Cash Collateral (including the provision of adequate protection described in the Cash Collateral Motion) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Therefore, on behalf of the Debtors, I submit that they should be authorized to use the Cash Collateral on the terms set forth in the Budget.

120.    As of November 30, 2017, Rentech had $14,160,502 in cash in its bank accounts and there was approximately $2,970,000 million in the Debtors' Bank Account as of the Petition Date.  In addition, the Debtors expect to receive at least $32 million in net sale proceeds resulting from the Non-Debtor Subsidiary Sales and the Atikokan Sale.  The foregoing demonstrates that a significant equity cushion exists to protect the Prepetition Lenders' interests in the Prepetition Collateral.  In addition, it is my understanding that as adequate protection under Bankruptcy Code Sections 363(e) and 361(1)-(3), the Debtors have agreed to provide the Prepetition Lenders with, among other things, (a) the Adequate Protection Liens and (b) the Superpriority Claims; *provided* that the proposed adequate protection shall be subject and subordinate in all respects only to the Carve-Out.  The Adequate Protection Liens cover all of the Debtors' assets.

121.    A substantial amount of the Debtors' assets purportedly are encumbered under the Prepetition Documents.  Therefore, it would be impossible to operate the Debtors' businesses and conduct the Chapter 11 Cases absent authorization to use Cash Collateral.  Unless the Court

authorizes the use of Cash Collateral, the Debtors' operations would likely cease, resulting in adverse effects on the value of the Debtors' estates to the severe detriment to all stakeholders, including, without limitation, potential disruption to the Non-Debtor Subsidiary Sales and/or the Atikokan Sale.

122.    As described above, the Debtors have an urgent and immediate need for cash in order to maintain the status quo through the pendency of the Chapter 11 Cases in order to effectuate the Non-Debtor Subsidiary Sales and the Atikokan Sale (including by making payroll and otherwise financing their operations).

123.    For the foregoing reasons, I believe that authorization to use Cash Collateral is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**E.      Motion of Debtors for Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "<u>Utilities Motion</u>")**

124.    In the Utilities Motion, the Debtors request entry of interim and final orders (a) prohibiting the Utility Providers (as defined below) from altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition; (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

125.    In conjunction with their day-to-day operations, the Debtors receive traditional utility services from various utility providers (each, a "**<u>Utility Provider</u>**" and collectively, the "**<u>Utility Providers</u>**"), for, among other things, technology services, internet, telecommunication and telephone services, and other similar services (collectively, the "**<u>Utility Services</u>**").   The

Utility Providers include, without limitation, the entities set forth on the list attached to the Utilities Motion as Exhibit C (the "**Utility Providers List**").

126.    I have been informed that the Debtors have paid an average of approximately $31,005 per month on account of all Utility Services during 2017.

127.    I believe that the Debtors' receipt of uninterrupted Utility Services is vital to their and the Non-Debtor Subsidiaries' continued business operations and, consequently, the Debtors' ability to maximize value through the prosecution of the Chapter 11 Cases.

   **F.    Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 362(a)(3), and 541 Establishing Notice and Hearing Procedures for Trading of Rentech Equity Securities (the "Equity Trading Motion")**

128.    In the Equity Trading Motion, the Debtors seek entry of an interim and final orders establishing notification and hearing procedures for certain transfers of Rentech, Inc. equity securities, including Options to acquire such equity securities, that must be complied with before such transfers of equity securities are deemed effective.  The procedures for trading of Rentech, Inc. equity securities are necessary to protect and preserve the value of the Debtors' U.S. federal and state tax attributes, if any, including but not limited to, significant net operating loss carryforwards ("**NOLs**" and, collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits and other tax attributes, the "**Tax Attributes**").

129.    As of the Petition Date, there were approximately 23.3 million common shares of Rentech, Inc. outstanding, with a par value of $.01 per share.  The Debtors are seeking to establish the notice and hearing procedures at this stage in the Chapter 11 Cases because of the potentially taxable gains that may arise from the CVR Unit Transfer and the anticipated Non-Debtor Subsidiary Sales.  In light of such gains, it is my understanding that there is the potential for a significant uptick in the trading of Rentech, Inc. equity securities, which may trigger

51

limitations on the use of the Debtors' Tax Attributes to offset such gains as described in the Equity Trading Motion.

130.    If no restrictions on trading are imposed by the Court, I believe that trading of Rentech, Inc. equity securities could severely limit or even eliminate the Debtors' ability to use their Tax Attributes, which could lead to significant negative consequences for the Debtors, their estates, creditors, stakeholders, and other parties in interest.  To preserve, to the fullest extent possible, the flexibility to maximize the use of their Tax Attributes, the Debtors seek limited relief that will enable the Debtors to closely monitor certain transfers of Rentech, Inc. equity securities, so as to be in a position to act expeditiously if necessary to preserve their Tax Attributes.  Thus, the Debtors request that the Court enter the Proposed Orders submitted with the Equity Trading Motion, in order to preserve the status quo in this regard.

131.    It is my understanding that the Debtors have generated, and are currently generating, a significant amount of Tax Attributes for U.S. federal income tax purposes.  The Debtors estimate that they have U.S. federal NOLs of approximately $60,591,000 that may be available to offset future taxable income.  In the Equity Trading Motion, the Debtors seek authorization to protect and preserve the value of their Tax Attributes, including, without limitation, their NOLs.  While the value of the Debtors' Tax Attributes is contingent upon the amount of the Debtors' future taxable income that may be offset by the Tax Attributes before they expire, the Debtors' NOLs and other Tax Attributes could translate into potential future tax savings for the Debtors.

132.    I believe that the Debtors' Tax Attributes are a valuable asset because the Debtors generally can carry forward their Tax Attributes to reduce or eliminate their income tax liability. In particular, the Tax Attributes may be available to the Debtors to offset future taxable income

generated by the CVR Unit Transfer and the Non-Debtor Subsidiary Sales. Additionally, it is my understanding that the Debtors can carry forward the NOLs and credits to reduce their future tax liability, thereby potentially recovering cash for the benefit of their estates.

133. By establishing procedures for continuously monitoring the trading of Rentech, Inc. equity securities, the Debtors can preserve their ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading of Rentech, Inc. equity securities may jeopardize the use of their Tax Attributes.

G. **Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (C) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (D) Authorizing Payment of Withholding and Payroll-Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and (F) Authorizing Payment of Prepetition Claims Owing to Administrators and Third-Party Providers (the "<u>Employee Wage and Benefits Motion</u>")**

134. In the Employee Wage and Benefits Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, PTO and Vacation Time, the Business Expenses, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including the Administrative Fee Obligations) (collectively, the "**<u>Employee Obligations</u>**"), and (b) maintain, continue, and honor, in the ordinary course of business, their PTO, Vacation Time, and holiday pay policies, their Business Expenses policy, the Employee Benefits Plans, and the Workers' Compensation Claims (collectively, the "**<u>Employee Plans and Programs</u>**").

135.    To enable the Debtors to carry out the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions, to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether such checks were presented or electronic-payment requests were submitted prior to or after the Petition Date.

136.    I believe that the Debtors' ability to preserve their and the Non-Debtor Subsidiaries' businesses during the Chapter 11 Cases and to maximize the value of the Debtors' estates for their creditors is dependent upon the expertise, continued enthusiasm, and service of the Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, and the liquidation proposed in the Combined Plan and Disclosure Statement, I believe that the morale and, thus, the performance of the Debtors' Employees may be adversely impacted.  The loss of certain Employees could impede the Debtors' ability to successfully maximize the value for the Debtors' estates while minimizing the administrative expenses incurred during the Chapter 11 Cases.

137.    If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will likely seek employment elsewhere.  The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' and the Non-Debtor Subsidiaries' businesses and the Debtors' ability to maximize value through the prosecution of the Chapter 11 Cases.

138.    The Debtors also regularly utilize the services of contract works (the "**Contract Workers**", and, together with the Employees, the "**Workforce**") to provide a variety of services.

The Contract Workers are generally engaged as independent contractors or provided by Robert Half International, Inc, and the number of Contract Workers fluctuates depending on the Debtors' needs.  At any given time, the Debtors may have approximately zero to four Contract Workers engaged.  I understand that the Debtors currently have one Contract Worker engaged. In 2017, the Debtors spent approximately $30,000 in connection with the engagement of Contract Workers.

139.    The Contract Workers fill certain critical and immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner.  In such capacity, the current Contract Worker provides assistant services to Rentech, Inc.'s general counsel, as needed.  The Contract Workers are a reliable and cost-efficient component of the Debtors' operations.  Thus, as with the Debtors' regular Employees, I believe that if the Debtors fail to honor their prepetition compensation obligations to the Contract Workers, it is likely that the Debtors will lose such individuals' valuable services, which will thereby impede the Debtors' ability to maximize value.

140.    In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce.  The Debtors also provide other benefits to their Employees for the performance of services.  These benefits and obligations are described in more detail in the Employee Wage and Benefits Motion.

141.    I believe that if the Debtors are unable to satisfy the Employee Obligations, Employee morale and loyalty will suffer at a time when Employee support is critical.  Further, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefits Plans, the Employees' health coverage could be threatened, potentially burdening individual Employees with the costs of health care.  At a minimum, the loss of health care

coverage, or uncertainty regarding coverage, would result in considerable anxiety for the Employees at a time when the Debtors need their Employees to perform their jobs at peak efficiency.  For all of the foregoing reasons, a sound business purpose exists to pay the Employee Obligations.

142.    Furthermore, in the absence of such payments, I believe that the Employees may seek alternative employment opportunities.  Such a development would deplete the Workforce and hinder the Debtors' ability to maximize value for their creditors.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors must focus on maximizing value for their creditors.  Accordingly, I believe that the Debtors must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, as set forth in the Employee Wage and Benefits Motion.

143.    For the reasons set forth herein and expanded upon in the Employee Wage and Benefits Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

## III.    RETENTION APPLICATION

### A.    Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "Section 156(c) Application")

144.    In the Section 156(c) Application, the Debtors request entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors and their Chapter 11

Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.  It is my understanding that the Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I submit that, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

145.   Additionally, under the terms of the Engagement Agreement, the Debtors have agreed to indemnify, defend, and hold harmless Prime Clerk and its members, officers, employees, representatives, and agents under certain circumstances specified in the Engagement Agreement, except in circumstances resulting solely from Prime Clerk's gross negligence or willful misconduct or as otherwise provided in the Engagement Agreement.  I believe that such an indemnification obligation is customary, reasonable, and necessary to retain the services of Prime Clerk in the Chapter 11 Cases.

146.   Although the Debtors do not propose to employ Prime Clerk under Bankruptcy Code Section 327 pursuant to the Section 156(c) Application (such retention will be sought by separate application), I have been informed that Prime Clerk has nonetheless reviewed its electronic database to determine whether it has any relationships with the creditors and parties in interest provided by the Debtors, and, to the best of the Debtors' knowledge, information, and belief, and except as disclosed in the Weiner Declaration, Prime Clerk has represented that it

neither holds nor represents any interest materially adverse to the Debtors' estates in connection with any matter on which it would be employed.

147.    It is my understanding that there will be in excess of 600 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

## IV.    CONCLUSION

148.    The Debtors' ultimate goal is to consummate the Non-Debtor Subsidiary Sales, the Atikokan Sale, and any other sales of the Non-Debtor Subsidiaries and/or their assets in order to maximize value for the benefit of their estates.  In the near-term, however, to minimize any loss of value of Rentech's businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to Rentech's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirming a chapter 11 plan will be substantially enhanced.

149.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of December 2017.

<div style="margin-left: 40%;">

Rentech WP U.S. Inc., et al.
Debtors and Debtors-in-Possession


/s/ Paul Summers
Paul Summers Chief Financial Officer of
Rentech WP U.S. Inc.

</div>

## **Exhibit A**

Organizational Chart

# Rentech, Inc. and Consolidated Subsidiaries

---- = No Operations/Holding Company
ALL CAPS indicates publicly-traded entity



